## DEBTOR IN POSSESSION LOAN AND SECURITY AGREEMENT

**THIS DEBTOR IN POSSESSION LOAN SECURITY AGREEMENT** (the "**Agreement**") is made effective the ___ day of May, 2010, by and among **DIETRICH'S SPECIALTY PROCESSING, LLC** ("**Borrower**") and **VIST BANK** ("**Bank**").

**NOW, THEREFORE**, in consideration of the terms and conditions contained herein, and of any extensions of credit now or hereafter made to or for the benefit of Borrower by Bank, the parties hereto, intending to be legally bound hereby, agree as follows:

1.     **DEFINITIONS.**

    1.1     **Defined Terms**.  The following words and phrases as used in capitalized form in this Agreement, whether in the singular or plural, shall have the meanings indicated:

        (a)     "**Account**", "**Account Debtor**", "**Chattel Paper**", "**Commercial Tort Claims**", "**Deposit Accounts**", "**Documents**", "**Electronic Chattel Paper**", "**Equipment**", "**Fixtures**", "**General Intangibles**", "**Goods**", "**Instruments**", "**Inventory**", "**Investment Property**", "**Letter-of-Credit Right**", "**Proceeds**" and "**Tangible Chattel Paper**" shall have the respective meanings assigned to such terms in the Pennsylvania Uniform Commercial Code, as the same may be in effect from time to time

        (b)     "**Advance**" means any loan or extension of credit by Bank to Borrower.

        (c)     "**Advance Period**" means the period of time commencing on the date hereof and continuing through and including the Maturity Date.

        (d)     "**Affiliate**", as to any Person, means (i) each other Person that directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person in question and (ii) any person who is an officer, director, member, manager or partner of (A) such Person, (B) any Subsidiary of such Person, or (C) any Person described in the preceding clause (i).

        (e)     "**Bank**" shall have the meaning given such term in the introductory paragraph of this Agreement and shall include all permitted successors and assigns of such Person.

        (f)     "**Bank Indebtedness**" shall mean all obligations and Indebtedness of Borrower to Bank or any Affiliate of Bank, whether now or hereafter owing or existing, including, without limitation, all obligations under the Loan Documents, all obligations to reimburse Bank or any Affiliate of Bank for payments made by Bank or any such Affiliate pursuant to any letter of credit issued for the account or benefit of Borrower by Bank or any Affiliate of Bank, all other obligations or undertakings now or hereafter made by or for the benefit of Borrower to or for the benefit of Bank or any Affiliate of Bank under any other agreement, promissory note or undertaking now existing or hereafter entered into by Borrower with Bank or any such Affiliate, including, without limitation, all obligations of Borrower to Bank or any Affiliate of Bank under any guaranty or surety agreement and all obligations of

Borrower to immediately pay to Bank or any Affiliate of Bank the amount of any overdraft on any deposit account maintained with Bank or any Affiliate of Bank, together with all interest and other sums payable in connection with any of the foregoing.

(g)    **"Bankruptcy Case"** shall mean the case under Chapter 11 of the Bankruptcy Code in which the Borrower is a debtor and debtor-in-possession, pending before the Bankruptcy Court.

(h)    **"Bankruptcy Code"** shall mean the United States Bankruptcy Code, 11 U.S.C. § 101 et seq., as in effect from time to time.

(i)    **"Bankruptcy Court"** shall mean the United States Bankruptcy Court for the District of Delaware, together with any other court having jurisdiction over the Bankruptcy Case.

(j)    **"Bankruptcy Rule(s)"** shall mean the Federal Rules of Bankruptcy Procedure, as amended from time to time.

(k)    "**Borrower**" shall have the meanings given such term in the introductory paragraph of this Agreement and shall include all permitted successors and assigns of Borrower.

(l)    **"Budget"** shall mean the budget prepared in good faith based upon assumptions which the Borrower believes to be reasonable setting forth, inter alia, a thirteen (13) week cash flow forecast in reasonable detail satisfactory to Bank including receipts, disbursements and such line item detail as satisfactory to Bank, as well as projected borrowings and availability under this Agreement, in the form attached hereto as **Exhibit B** (a true, complete and correct copy of which has been provided to Bank prior to the date hereof).

(m)    **"Budget Compliance"** shall mean that as of any time of analysis, the actual amount of cash funds and receipts received by the Borrower and cash disbursements made and expenses incurred by the Borrower during the prior week or Cumulative Period (and on a pro forma basis after giving effect to any advance then requested under this Agreement) do not vary from the Budget by an amount greater than (a) five percent (5%) with respect to cash disbursements and expenses incurred and (b) five percent (5%) with respect to receipts; provided, however, that cash disbursements cannot exceed the budgeted disbursements by up to 5% unless the actual receipts exceed the budgeted receipts by more than 5%.

(n)    "**Business Day**" means any day which is neither a Saturday or Sunday nor a legal holiday on which commercial banks are authorized or required to be closed in Philadelphia, Pennsylvania.

(o)    **"Carve-Out"** shall mean, at the time of reference thereto, the lesser of (i) the sum of (a) up to $78,000 in accrued, unpaid fees and expenses for the Borrower's counsel, plus (b) up to $52,000 in accrued, unpaid fees and expenses for Penn Hudson, Debtors management consultant, plus (c) up to $26,000 in accrued, unpaid fees and expenses for Debtor's outside accountant; plus (d) up to $40,000 in accrued, unpaid fees and expenses for Committee professionals, plus (e) up to $15,000 for fees payable pursuant to 28 U.S.C. § 1930(a)(6) (**"UST**

Fees"), collectively subject to an aggregate cap of up to $198,000, in all events only with respect to the foregoing fees and expenses which are incurred on and after the Filing Date and before the Carve-Out Funding Date and from which aggregate cap amount of $198,000 Bank shall be entitled to credit all amounts actually received by professionals after the Petition Date regardless when after the Petition Date and before the Carve-Out Funding Date such fees are incurred, and Bank acknowledges that such fees and expense may have been incurred or accrued in weeks other than the weeks in which they are reflected in the Budget; or (ii) the sum of (a) UST Fees plus (b) all allowed Chapter 11 administrative expenses arising in the Bankruptcy Case through the earlier of (x) the date on which the Bankruptcy Case is converted to a case under Chapter 7 of the Bankruptcy Code, and (y) the termination of the Line to the Borrower for the payment of UST Fees and allowed professional administrative expenses.

(p)    **"Carve-Out Funding Date"** shall mean the earlier of (a) the date on which the Bankruptcy Case is converted to a case under Chapter 7 of the Bankruptcy Code, and (b) the termination of the Line to the Borrower.

(q)    "**Collateral**" shall mean all of the property of Borrower described in Section 5 hereof, together with all other real or personal property of Borrower or any other Person now or hereafter pledged to Bank to secure, either directly or indirectly, repayment of any of the Bank Indebtedness.

(r)    "**Corporation**" means a corporation, partnership, limited liability company, trust, unincorporated organization, association, joint stock company or joint venture.

(s)    "**Cumulative Period**" shall mean the period from the Filing Date through the Friday of the most recent one-week period then ended or if a one-week period has not then elapsed from the Filing Date, such shorter period since the Filing Date through the Friday of the most recent week then ended.

(t)    "**Default**" means any event which with the giving of notice, passage of time or both, would constitute an Event of Default.

(u)    "**Default Rate**" means, at any time, the sum of the Prime Rate in effect from time to time, plus the Default Rate Margin in effect from time to time.

(v)    "**Default Rate Margin**" means, on a cumulative basis, commencing on the third (3rd) day following written notice from Bank to Borrower of the occurrence of an Event of Default, 300 basis points for each 30 day period (or any part thereof) following the occurrence and continuance of such Event of Default.

(w)    "**Environmental Requirements**" means any and all applicable federal, state or local laws, statutes, ordinances, regulations or standards, administrative or court orders or decrees, common law doctrines or private agreements, relating to (i) pollution or protection of the environment and natural resources, (ii) exposure of employees or other persons to Special Materials, (iii) protection of the public health and welfare from the effects of Special Materials and their products, by-products, wastes, emissions, discharges or releases, and (iv) regulation, licensing, approval or authorization of the manufacture, generation, use, formulation,

B # 1131504 v.1

packaging, labeling, transporting, distributing, handling, storing or disposing of any Special Materials.

(x)    "**Event of Default**" means each of the events specified in **Section 13.1**.

(y)    **"Existing Financing Agreements"** shall mean (i) the certain Line of Credit Loan Note and the Line of Credit Loan Security Agreement each dated April 18, 2006 pursuant to which Bank extended to Borrower a line of credit in the original principal amount of $1,000,000; (ii) the Permanent Equipment Loan Note and the Security Agreement each dated November 1, 2006 evidencing Borrower's obligation to repay Bank for a loan in the original principal amount of $550,000; (iii) the Permanent Equipment Loan Note and the Permanent Equipment Loan Security Agreement each dated April 18, 2006 pursuant to which Bank extended to Borrower a term loan in the original principal amount of $1,750,000; (iv) the Construction Loan Note and the Construction Loan Security Agreement each dated April 18, 2006 pursuant to which Bank extended to Borrower a construction loan in the original principal amount of $1,050,000 and (v) the Variable Rate Promissory Note and the Permanent Equipment Loan Security Agreement each dated August 28, 2007 in the original principal amount of $200,000 and (vi) the Equipment Loan Note and the Business Loan Agreement dated August 28, 2007 pursuant to which the Bank extended to Borrower a loan in the original principal amount of $500,000 and all related documents, instruments supporting obligations and agreements, contemplated thereby, as any or all of the foregoing have been amended, modified, supplemented or extended from time to time.

(z)    **"Financing Order(s)"** shall mean, as applicable, an order (whether the Interim Order or the Final Order) entered in the Bankruptcy Case, from time to time, in form and substance satisfactory to Bank, authorizing the Borrower to obtain the financing contemplated by and described in this Agreement.

(aa)    **"Filing Date"** shall mean May 10, 2010

(bb)    **"Final Order"** shall mean a final order of the Bankruptcy Court in the Bankruptcy Case authorizing and approving this Agreement and the other Loan Documents under Sections 364(c) and (d) of the Bankruptcy Code, and entered at or after a final hearing, in form and substance satisfactory to Bank. The Final Order shall include, without limitation, provisions that have:

(i)    authorized the transactions contemplated by this Agreement and the extensions of credit under this Agreement in an amount not less than the [Maximum Limit];

(ii)    granted the claim and lien status and liens described in Sections 5.1 and 6, and prohibited the granting of additional liens on the assets of Borrower, other than Statutory Encumbrances;

(iii)    provided that such liens are automatically perfected by the entry of the Final Order and also granted to Bank;

B # 1131504 v.1

(iv)     granted relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable Bank, if Bank elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by Bank to perfect, protect and ensure the priority of its liens upon the Collateral as a matter of non-bankruptcy law;

(v)     provided that no Person will be permitted to surcharge the Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve-Out;

(vi)     provided Bank with relief from the automatic stay in a manner consistent with the terms of Section 8.2;

(vii)     provided that the Bankruptcy Case may not be dismissed unless the Obligations have been indefeasibly paid in full in cash and this Agreement has been terminated;

(viii)     found that the credit extended hereunder and the negotiation of this Agreement and the other Loan Documents have been made and done in good faith and therefore the Obligations incurred and the granting, perfection and priority of the liens hereunder and thereunder are entitled to the protections in Section 364(e) of the Bankruptcy Code; and

(ix)     approving the use of cash collateral and approving replacement liens and other adequate protection to Bank.

(cc)     "**GAAP**" means generally accepted accounting principles in the United States of America, in effect from time to time, consistently applied and maintained.

(dd)     "**Guarantor**" means Thomas W. Dietrich and Marybeth A. Dietrich.

(ee)     "**Indebtedness**", as applied to a Person, means:

(i)     all items (except items of capital stock or of surplus) which in accordance with GAAP would be included in determining total liabilities as shown on the liability side of a balance sheet of such Person as at the date as of which Indebtedness is to be determined;

(ii)     to the extent not included in the foregoing, all indebtedness, obligations, and liabilities secured by any mortgage, pledge, lien, conditional sale or other title retention agreement or other security interest to which any property or asset owned or held by such Person is subject, whether or not the indebtedness, obligations or liabilities secured thereby shall have been assumed by such Person; and

(iii)     to the extent not included in the foregoing, all indebtedness, obligations and liabilities of others which such Person has directly or indirectly guaranteed, endorsed (other than for collection or deposit in the ordinary course of business), sold with recourse, or agreed (contingently or otherwise) to purchase or repurchase or otherwise acquire or

in respect of which such Person has agreed to supply or advance funds (whether by way of loan, stock purchase, capital contribution or otherwise) or otherwise to become directly or indirectly liable.

(ff)    "**Ineligible Professional Expenses**" shall mean fees or expenses incurred by any Person, including the Creditors' Committee, in (a) preventing, hindering or delaying Bank's enforcement or realization upon any of the Collateral once an Event of Default has been declared by Bank, (b) applying for or consummating use of cash collateral or sell any Collateral without Bank's prior written consent (except to the extent permitted by this Agreement), (c) incurring indebtedness without Bank's prior written consent (except to the extent permitted by this Agreement), (d) any action which contravenes a right or protection of Bank under the Loan Documents, and (e) objecting to or consenting in any manner, or in raising any defenses to, the validity, extent, perfection, priority or enforceability of the Obligations or any liens or claims with respect thereto, or any other rights or interests of Bank, or in asserting any claims, causes of action or equitable subordination claims against Bank.

(gg)    "**Interim Financing Order**" means an order of the Bankruptcy Court in the Bankruptcy Case authorizing and approving this Agreement and the other Loan Documents on an interim basis under Sections 364(c) and (d) of the Bankruptcy Code, and entered at or after a preliminary hearing under Rule 4001 of the Bankruptcy Code, in form and substance satisfactory to Bank. The Interim Financing Order shall include, without limitation, provisions that have:

(i)    authorized the transactions contemplated by this Agreement and the extensions of credit under this Agreement in an amount not less than the Maximum Line Amount;

(ii)    granted the claim and lien status and liens described in Sections 5.1 and 6, and prohibited the granting of additional liens on the assets of the Borrower other than Statutory Liens;

(iii)    provided that such liens are automatically perfected by the entry of the Interim Financing Order;

(iv)    granted relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable Bank, if Bank elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by Bank to perfect, protect and insure the priority of its liens upon the Collateral as a matter of non-bankruptcy law;

(v)    provided that no Person, effective as of entry of the Final Order or any extension of the Interim Financing Order, will be permitted to surcharge the Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve-Out;

(vi)    provided Bank with relief from the automatic stay in a manner consistent with the terms of Section 8.2;

B # 1131504 v.1

(vii)    provided that the Bankruptcy Case may not be dismissed unless the Obligations have been indefeasibly paid in full in cash and this Agreement has been terminated;

(viii)    found that the credit extended hereunder and the negotiation of this Agreement and the other Loan Documents have been made or done in good faith and therefore the Obligations incurred and the granting, perfection and priority of the liens hereunder and thereunder are entitled to the protections in Section 364(e) of the Bankruptcy Code; and

(ix)    approving the use of cash collateral, the repayment in full, in cash of all obligations owing to Bank as pre-petition lender under the Existing Financing Agreements of all sums due and owing to them, the refinancing of which shall constitute Obligations owing under this Financing Agreement.

(hh)    "**Line**" shall have the meaning given such term in **Section 2.1** hereof.

(ii)    "**Line Advances**" shall mean all Advances under the Line.

(jj)    "**Loan Account**" has the meaning given such term in **Section 4.6** hereof.

(kk)    "**Loan Documents**" means this Agreement, the Note, the Surety Agreements and all other documents executed or delivered by Borrower, Guarantors or any other Person pursuant to this Agreement or in connection herewith, as they may be amended, modified or restated from time to time.

(ll)    "**Loan**" means the Line and any and all Advances made thereunder.

(mm)    "**Material Adverse Effect**" means a material adverse effect (i) on the business, operations, assets, management, liabilities or condition of any Borrower, or (ii) on the ability of any Borrower to perform its obligations under the Loan Documents.

(nn)    "**Maturity Date**" means the earlier of (i) June 30, 2010 and (ii) the first day on which demand is made under this Agreement for payment in full of all Bank Indebtedness.

(oo)    "**Maximum Line Amount**" means an amount up to Five Hundred Thousand Dollars ($500,000.00).

(pp)    "**Note**" shall have the meaning given such term in **Section 2.1** hereof.

(qq)    "**OFAC**" shall mean the U.S. Department of the Treasury's Office of Foreign Assets Control.

(rr)    "**Person**" means an individual, a Corporation or a government or any agency or subdivision thereof, or any other entity.

(ss)    **"Professional Expenses"** shall mean at the time of reference thereto, allowed and unpaid fees, costs and reasonable expenses of professionals retained in the Bankruptcy Case pursuant to Sections 327 and 1103 of the Bankruptcy Code consisting of attorneys, accountants, financial advisors, and consultants retained by the Borrower (and solely with respect to fees, costs and expenses incurred by such professionals in direct representation of the Borrower during the Chapter 11) or the Creditors' Committee; provided, however, that the amount of Professional Expenses shall not exceed the applicable Professional Expense Cap if in effect at the time of reference thereto. The term does not include any Ineligible Professional Expenses or the expenses of any professionals engaged by individual members of the Creditors' Committee.

(tt)    "**Professional Expense Cap**" shall mean $198,000.  All payments of Priority Professional Expenses made on and after the date on which Bank has declared an Event of Default shall reduce the Professional Expense Cap dollar for dollar.

(uu)    "**Prime Rate**" means, at any time and from time to time, the greater of (i) 5% and (ii) the rate per annum equal to the rate of interest announced by Bank as its "Prime Rate."  Any change in the Prime Rate shall be effective immediately and after such change in the Prime Rate.  Borrower acknowledge that Bank may make loans to its customers above, at or below the Prime Rate.

(vv)    "**Reorganization Plan**" shall mean any plan or plans of reorganization proposed or confirmed in the Bankruptcy Case.

(ww)    "**Sanctioned Country**" shall mean a country subject to a sanctions program identified on the list maintained by OFAC and available at http://www.treas.gov/offices/eotffc/ofac/sanctions/index.html, or as otherwise published from time to time.

(xx)    "**Sanctioned Person**" shall mean (i) a person named on the list of Specially Designated Nationals or Blocked Persons maintained by OFAC available at http://www.treas.gov/offices/eotffc/ofac/sdn/index.html, or as otherwise published from time to time, or (ii) (A) an agency of the government of a Sanctioned Country, (B) an organization controlled by a Sanctioned Country, or (C) a person resident in a Sanctioned Country, to the extent subject to a sanctions program administered by OFAC.

(yy)    "**Special Materials**" means any and all materials which, under Environmental Requirements, require special handling in use, generation, collection, storage, treatment or disposal, or payment of costs associated with responding to the lawful directives of any court or agency of competent jurisdiction.  Special Materials shall include, without limitation:  (i) any flammable substance, explosive, radioactive material, hazardous material, hazardous waste, toxic substance, solid waste, pollutant, contaminant or any related material, raw material, substance, product or by-product of any substance specified in or regulated or

otherwise affected by any Environmental Requirements (including but not limited to any "hazardous substance" as defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1980 as amended or any similar state or local law), (ii) any toxic chemical or other substance from or related to industrial, commercial or institutional activities, and (iii) asbestos, gasoline, diesel fuel, motor oil, waste and used oil, heating oil and other petroleum products or compounds, polychlorinated biphenyls, radon, urea formaldehyde and lead-containing materials.

(zz)    "**Statutory Liens**" shall mean liens for taxes, assessments, fees, and other governmental charges.

(aaa)    "**Subsidiary**" means a Corporation (i) which is organized under the laws of the United States or any State thereof, or any other county or jurisdiction, (ii) which conducts substantially all of its business and has substantially all of its assets within the United States and (iii) of which more than fifty percent (50%) of its outstanding voting stock of every class (or other voting equity interest) is owned by a Borrower or one or more of its Subsidiaries.

(bbb)    "**Superpriority Claim**" shall mean an allowed claim against the Borrower or its estate in the Bankruptcy Case, which is an administrative expense claim having priority over (a) any and all allowed administrative expenses, and (b) unsecured claims now existing or hereafter arising, including any administrative expenses of the kind specified in the Bankruptcy Code, including Sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507, 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code.

(ccc)    "**Surety Agreement**" means that certain Surety Agreement of even date herewith from Guarantor to Bank.

(ddd)    "**Taxes**" has the meaning given to such term in **Section 4.8**.

1.2    **Accounting Terms**.  As used in this Agreement, or any certificate, report or other document made or delivered pursuant to this Agreement, accounting terms not defined elsewhere in this Agreement shall have the respective meanings given to them under GAAP.

2.    **THE LINE; USE OF PROCEEDS.**

2.1    **Line of Credit**.

(a)    Bank will establish for Borrower for and during the Advance Period, subject to the terms and conditions hereof, a non-revolving line of credit ("**Line**") pursuant to which Bank will from time to time make Advances to Borrower in an aggregate amount not exceeding at any time the Maximum Line Amount.  The Line shall be subject to all terms and conditions set forth in all of the Loan Documents, which terms and conditions are incorporated herein.  Borrower's obligation to repay Advances under Line shall be evidenced by Borrower's promissory note ("**Note**") in the face amount of Five Hundred Thousand Dollars ($500,000.00), which shall be in the form attached hereto as **Exhibit "A"**, with the blanks appropriately filled in.

B # 1131504 v.1

2.2    **Use of Proceeds**.  Borrower shall use Line Advances for working capital purposes, to pay interest owed to Bank on other prior-existing facilities and for certain professional fees incurred in a connection with the Bankruptcy Case subject to the terms of the Orders entered or to be entered in the Bankruptcy Case approving the Line.

2.3    **Method of Advances**.

(a)    **Line Advances**.  On any Business Day, Borrower may request an Advance under the Line no later than 3:00 p.m. Eastern time then in effect on the Business Day such Advance is requested to be funded.  Each request for an Advance under the Line shall be in writing and shall be conclusively presumed to be made by a Person authorized by Borrower to do so and, once received by Bank, shall be deemed irrevocable.  No Line Advances shall be available after the first to occur of (i) expiration of the Advance Period or (ii) a Default or an Event of Default.

(b)    **Funding of Advances**.  Subject to the terms and conditions of this Agreement, Bank may make the proceeds of an Advance available to Borrower by crediting such proceeds to Borrower's deposit account with Bank.

3.    **INTEREST RATE.**

3.1    **Interest on the Lines**.  Interest on the outstanding principal amount of each Advance shall accrue at the Prime Rate.

3.2    **Default Interest**.  Interest will accrue on the principal balance of each of the Lines at the Default Rate in effect from time to time, commencing on the third (3rd) day after written notice from Bank to Borrower of the occurrence of an Event of Default.

3.3    **Post Judgment Interest**.  Any judgment obtained for sums due hereunder or under the Loan Documents will accrue interest at the Default Rate in effect from time to time until paid.

3.4    **Calculation**.  Interest will be computed on the basis of a year of 360 days and paid for the actual number of days elapsed.

3.5    **Limitation of Interest to Maximum Lawful Rate**.  In no event will the rate of interest payable hereunder exceed the maximum rate of interest permitted to be charged by applicable law (including the choice of law rules) and any interest paid in excess of the permitted rate will be refunded to Borrower.  Such refund will be made by application of the excessive amount of interest paid against any sums outstanding hereunder and will be applied in such order as Bank may determine.  If the excessive amount of interest paid exceeds the sums outstanding, the portion exceeding the sums outstanding will be refunded in cash by Bank.  Any such crediting or refunding will not cure or waive any default by Borrower.  Borrower agrees, however, that in determining whether or not any interest payable hereunder exceeds the highest rate permitted by law, any non-principal payment, including without limitation prepayment fees and late charges, will be deemed to the extent permitted by law to be an expense, fee, premium or penalty rather than interest.

B # 1131504 v.1

4.      **PAYMENTS AND FEES.**

4.1      **Interest Payments on the Line**.    Borrower will pay interest on outstanding Advances under the Line on the first day of each month, commencing on the first day of the first month following the date hereof.

4.2      **Principal Payments on the Line**.  Borrower will pay the outstanding Advances under the Line, together with any accrued and unpaid interest thereon, and any other sums due pursuant to the terms hereof, ON DEMAND after the occurrence of an Event of Default, but in no event later than June 30, 2010.

4.3      **Late Charge**.   In the event that Borrower fails to pay any principal, interest or other fees or expenses payable hereunder for a period of at least ten (10) days after any such payment is first due, in addition to paying such sums, Borrower will pay to Bank a late charge equal to five percent (5%) of such past due payment as compensation for the expenses incident to such past due payment.

4.4      **Payment Method**.   Borrower irrevocably authorizes Bank to debit all payments required to be made by Borrower hereunder on the date due from any deposit account maintained by Borrower with Bank or to charge any or all of such payments as an Advance under the Line.  Otherwise, Borrower will be obligated to make such payments directly to Bank. All payments are to be made in immediately available funds.  If Bank accepts payment in any other form, such payment shall not be deemed to have been made until the funds comprising such payment have actually been received by or made available to Bank.

4.5      **Application of Payments**.  Any and all payments on account of any of the Loan will be applied to accrued and unpaid interest, outstanding principal and other sums due hereunder or under the Loan Documents, in such order as Bank, in its discretion, elects.   If Borrower makes a payment or payments and such payment or payments, or any part thereof, are subsequently invalidated, declared to be fraudulent or preferential, set aside or are required to be repaid to a trustee, receiver, or any other person under any bankruptcy act, state or federal law, common law or equitable cause, then to the extent of such payment or payments, the obligations or part thereof hereunder intended to be satisfied shall be revived and continued in full force and effect as if said payment or payments had not been made.

4.6      **Loan Account**.  Bank will open and maintain on its books a loan account (the "**Loan Account**") with respect to Advances made, repayments, prepayments, the computation and payment of interest and fees and the computation and final payment of all other amounts due and sums paid to Bank under this Agreement.  Except in the case of manifest error in computation, the Loan Account will be conclusive and binding on the Borrower as to the amount at any time due to Bank from Borrower under this Agreement or the Note.

4.7      **Indemnity; Loss of Margin**.  Borrower hereby indemnifies Bank against any loss or expense which Bank sustains or incurs as a consequence of an Event of Default by Borrower, including, without limitation, any failure of Borrower to pay when due (at maturity, by acceleration or otherwise) any principal, interest, fee or any other amount due under this Agreement or the other Loan Documents.  If Bank sustains or incurs any such loss or expense it

B # 1131504 v.1

will from time to time notify the Borrower in writing of the amount determined in good faith by the Bank to be necessary to indemnify Bank for the loss or expense.  Such amount will be due and payable by Borrower to Bank within ten (10) days after presentation by Bank of a statement setting forth a brief explanation of and Bank's calculation of such amount, which statement shall be conclusively deemed correct absent manifest error.  Any amount payable to the Bank under this Section will bear interest at the highest default rate payable hereunder from the due date until paid, both before and after judgment.

In the event that any present or future law, rule, regulation, treaty or official directive or the interpretation or application thereof by any central bank, monetary authority or governmental authority, or the compliance with any guideline or request of any central bank, monetary authority or governmental authority (whether or not having the force of law):

(a)     subjects Bank to any tax with respect to any amounts payable under this Agreement or the other Loan Documents by Borrower or otherwise with respect to the transactions contemplated under this Agreement or the other Loan Documents (except for taxes on the overall net income of Bank imposed by the United States of America or any political subdivision thereof); or

(b)     imposes, modifies or deems applicable any deposit insurance, reserve, special deposit, capital maintenance, capital adequacy, or similar requirement against assets held by, or deposits in or for the account of, or loans or Advances or commitment to make loans or Advances by, or letters of credit issued or commitment to issue letters of credit by, the Bank; or

(c)     imposes upon Bank any other condition with respect to Advances or extensions of credit or the commitment to make Advances or extensions of credit under this Agreement,

and the result of any of the foregoing is to increase the costs of Bank, reduce the income receivable by or return on equity of Bank or impose any expense upon Bank with respect to any Advances or extensions of credit or commitments to make Advances or extensions of credit under this Agreement, Bank shall so notify Borrower in writing.  Borrower agrees to pay Bank the amount of such increase in cost, reduction in income, reduced return on equity or capital, or additional expense within ten (10) days after presentation by Bank of a statement concerning such increase in cost, reduction in income, reduced return on equity or capital, or additional expense.  Such statement shall set forth a brief explanation of the amount and Bank's calculation of the amount (in determining such amount the Bank may use any reasonable averaging and attribution methods), which statement shall be conclusively deemed correct absent manifest error.  If the amount set forth in such statement is not paid within ten (10) days after such presentation of such statement, interest will be payable on the unpaid amount at the highest default rate payable hereunder from the due date until paid, both before and after judgment.

4.8     **Taxes**.  All payments by Borrower of amounts payable hereunder shall be made free and clear of and without deduction for any present or future income, excise, stamp or franchise taxes and other taxes, fees, duties, withholdings or other charges of any nature whatsoever imposed by any taxing authority, but excluding franchise taxes and taxes imposed on

B # 1131504 v.1

or measured by Bank's net income or receipts (such non-excluded items being called "**Taxes**"). In the event that any withholding or deduction from any payment to be made by Borrower hereunder is required in respect of any Taxes pursuant to any applicable law, rule or regulation, then Borrower will

(a)    pay directly to the relevant authority the full amount required to be so withheld or deducted;

(b)    promptly forward to the Bank an official receipt or other documentation satisfactory to Bank evidencing such payment to such authority; and

(c)    pay to Bank such additional amount or amounts as is necessary to ensure that the net amount actually received by Bank will equal the full amount Bank would have received had no such withholding or deduction been required.

Moreover, if any Taxes are directly asserted against Bank with respect to any payment received by Bank hereunder, Bank may pay such Taxes and Borrower will promptly pay such additional amount (including any penalties, interest or expenses) as is necessary in order that the net amount received by Bank after the payment of such Taxes (including any Taxes on such additional amount) shall equal the amount Bank would have received had not such Taxes been asserted.

If Borrower fails to pay any Taxes when due to the appropriate taxing authority or fails to remit to Bank the required receipts or other required documentary evidence, Borrower shall indemnify Bank for any incremental Taxes, interest or penalties that may become payable by Bank as a result of any such failure.

5.    **SUPERPRIORITY CLAIMS, ETC.**

5.1    **Superpriority Claims and Collateral Security**.    The Borrower represents, warrants and covenants that, upon the entry by the Bankruptcy Court of the Final Order, all of the Bank Indebtedness:

(a)    shall at all times constitute a Superpriority Claim having priority pursuant to Section 364(c)(1) of the Bankruptcy Code, over any claims of any Person, whether now existing or hereafter arising, including any claims under Sections 105(a), 326, 330, 328, 331, 503(a), 503(b), 506(c), 507, 546(c), 546(d), 726, 1 113 and 1 114 of the Bankruptcy Code, subject, as to priority, only to the Carve-Out; and

(b)    pursuant to Section 364(c) and Section 364(d) of the Bankruptcy Code shall at all times be secured by a first priority perfected lien in all of the assets, whether now owned or hereafter acquired, of the Borrower and its estate, subject, as to priority, only to the Carve-Out and Statutory Encumbrances securing those valid, perfected, non-avoidable secured claims existing on the Filing Date.   The liens securing the Obligations shall not be subject to Section 551 of the Bankruptcy Code.

The agreement of Bank to provide post-petition financing to the Borrower will not prohibit Bank from moving in the Bankruptcy Court for any other and further relief which Bank believes in

B # 1131504 v.1

good faith to be reasonably and immediately necessary to protect its rights with respect to the Collateral (including a request for Borrower to abandon any part of the Collateral) or otherwise.

        5.2    **No Filings Required**.  Notwithstanding Section 4, liens securing the Obligations shall be deemed valid and perfected and duly recorded by entry of the Interim Financing Order or the Final Order, whichever occurs first. Bank shall not be required to file any financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the lien granted by or pursuant to each Financing Order or this Agreement or any other Loan Document.

        5.3    **Grants, Rights and Remedies**.  The lien and administrative priority granted by or pursuant to the Financing Orders or this Agreement or any other Loan Document are independently granted. The Financing Orders and this Agreement and the other Loan Documents supplement each other, and the grants, priorities, rights and remedies of Bank hereunder and thereunder are cumulative.

        5.4    **No Discharge; Survival of Claims**.  The Borrower agrees that (a) the Obligations shall not be discharged by the entry of an order confirming a Reorganization Plan (and the Borrower, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge), (b) the Superpriority Claim granted to Bank pursuant to the Financing Orders, and the liens granted to Bank pursuant to the Financing Orders and the other Loan Documents, shall not be affected in any manner by the entry of an order confirming a Reorganization Plan, (c) the Borrower shall not propose or support any Reorganization Plan that is not conditioned upon termination of this Agreement and indefeasible payment in full in cash of all Obligations and the release of Bank in full from all claims of the Borrower and its estate, in each case, on or before the effective date of such Reorganization Plan, and (d) no Reorganization Plan shall be confirmed if it does not satisfy the foregoing requirements.

        5.5    **Survival**.  The liens, lien priority, administrative priorities and other rights and remedies granted to Bank pursuant to the Financing Orders, this Agreement and the other Loan Documents (including, without limitations, the existence, perfection and priority of the liens provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by the Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Bankruptcy Case, or by any other act or omission whatsoever. Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

        (a)    except for the Carve-Out, upon entry of a Final Order approving this Agreement and the other Loan Documents, no costs or expenses of administration which have been or may be incurred in the Bankruptcy Case or any conversion of the same or in any other proceedings related thereto, and no priority claims, including claims and charges under Section 506(c) of the Bankruptcy Code pursuant to Section 552(b) of the Bankruptcy Code (or otherwise), are or will be prior to or on a parity with any claim of Bank against the Borrower in respect of any Obligation;

B # 1131504 v.1

(b)    the liens securing the Obligations shall constitute valid and perfected liens and, subject only to the Carve-Out and Statutory Liens securing Senior Claims, shall be prior to all other liens, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

(c)    the liens securing the Obligations shall continue to be valid and perfected without the necessity that Bank file financing statements, mortgages or otherwise perfect its lien under applicable non-bankruptcy law.

5.6    **Disavowal Based on Changed Circumstances**.  The Borrower and Bank know and understand that there are rights and remedies provided under the Bankruptcy Code, the Federal Rules of Civil Procedure, and the Bankruptcy Rules, pursuant to which parties otherwise bound by a previously entered order can attempt to obtain relief from such an order by alleging circumstances that may warrant a change or modification in the order, or circumstances such as fraud, mistake, inadvertence, excusable neglect, newly discovered evidence, or similar matters that may justify vacating the order entirely, or otherwise changing or modifying it (collectively, "**Changed Circumstances**").  Rights and remedies based on Changed Circumstances include, but are not limited to, modification of a plan of reorganization after confirmation of the plan and before its substantial consummation, pursuant to Section 1127(b) of the Bankruptcy Code, relief from a final order or judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure and Bankruptcy Rule 9024, and the commencement and prosecution of a serial Chapter 11 case by a debtor which is in default of obligations under a stipulation or plan of reorganization confirmed in an earlier case.  With full knowledge and understanding of what are, or may be, its present or future rights and remedies based on allegations of Changed Circumstances, the Borrower: (i) expressly disavows that there are any matters which constitute any kind of Changed Circumstances as of the date hereof and (ii) expressly disavows as of the date hereof that it is aware of any matters whatsoever that it is assuming, contemplating, or expecting in proceeding with each Financing Order and the transactions contemplated by this Agreement and having any Financing Order entered that would serve as a basis to allege such Changed Circumstances.  The Borrower understands and agrees that Bank is not willing to bear any of the risks involved in the Borrower's business enterprises and Bank is not willing to modify any of the rights if such risks cause actual or alleged Changed Circumstances; and the Borrower expressly assumes all risks of any and all such matters, and the consequences that Bank will enforce its legal, equitable, and contractual rights if Bank is not paid and dealt with strictly in accordance with the terms and conditions of the applicable Financing Order and the other Loan Documents.  Without limiting the foregoing in any way, the Borrower's use of any cash collateral that is included in the Collateral will be governed exclusively by the terms and conditions of this Agreement and the applicable Financing Order, and, until all Obligations are indefeasibly paid and satisfied in full either before or after a termination of this Agreement, the Borrower will not seek authority from the Bankruptcy Court to otherwise use any cash collateral that is included in the Collateral for any purpose whatsoever.

5.7    **Prohibition on Surcharge; Etc.**  Upon entry of a Final Order approving this Agreement and the other Loan Documents, no Person will be permitted to surcharge the Collateral under Section 506(c) of the Bankruptcy Code Section 552(b) of the Bankruptcy Code (or otherwise), nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve-Out.  The prohibition on surcharging or priming of the liens of Bank on the

B # 1131504 v.1

Collateral will survive the termination of this Agreement and the dismissal of the Bankruptcy Case, such that no Person will be permitted to obtain a lien or rights (through any means, at law or in equity) which in any case is equal or senior to the liens of Bank on the Collateral.

6.    **COLLATERAL.**

6.1    **Grant of Security Interest to Bank**.

As security for the payment of the Line and all Advances now or in the future made by Bank to Borrower hereunder and for the payment or other satisfaction of all other Liabilities, Borrower hereby assigns to Bank and grants (and confirms and reaffirms its prior pledge and grant pursuant to the Existing Financing Agreements) to Bank a continuing security interest in the following property of Borrower, whether now or hereafter owned, existing, acquired or arising and wherever now or hereafter located:  (a) all Accounts (whether or not Eligible Accounts) and all Goods whose sale, lease or other disposition by Borrower has given rise to Accounts and have been returned to, or repossessed or stopped in transit by, Borrower; (b) all Chattel Paper, Instruments, Documents and General Intangibles (including, without limitation, all patents, patent applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, copyright applications, registrations, licenses, software, franchises, customer lists, tax refund claims, claims against carriers and shippers, guarantee claims, contract rights, payment intangibles, security interests, security deposits and rights to indemnification); (c) all Inventory (whether or not Eligible Inventory); (d) all Goods (other than Inventory), including, without limitation, Equipment, vehicles and Fixtures; (e) all Investment Property; (f) all Deposit Accounts, bank accounts, deposits and cash; (g) all Letter-of-Credit Rights; (h) all Real Property; (i) Commercial Tort Claims listed on Schedule 5(a) hereto, (j) any other property of Borrower now or hereafter in the possession, custody or control of Bank or any agent or any parent, affiliate or subsidiary of Bank or any participant with Bank in the Loan, for any purpose (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise) and (k) all additions and accessions to, substitutions for, and replacements, products and Proceeds of the foregoing property, including, without limitation, proceeds of all insurance policies insuring the foregoing property, and all of Borrower's books and records relating to any of the foregoing and to Borrower's business.

6.2    **Real Property**.  As further security for the Bank Indebtedness, Borrower shall grant to Bank a mortgage lien encumbering the premises situate at 61 Vanguard Drive, Exeter Township, Berks County, Pennsylvania and all improvements thereon and all rights, licenses, permits and approvals relating thereto, together with an assignment of all rents and leases related thereto (collectively, the **"Real Property"**).

6.3    **Life Insurance**.

As additional security for the Liabilities, Borrower shall cause to be assigned to Bank on the date hereof that certain key man life insurance Policy No. 00499405 issued by Empire General Live Assurance Corporation, insuring the life of Thomas W. Dietrich for an amount equal to at least $_____, pursuant to an assignment agreement in form and content satisfactory to Bank.

B # 1131504 v.1

6.4    **Surety**.

As additional security for the Liabilities, Borrower shall cause Guarantor to execute and deliver to Bank on the date hereof a Surety Agreement in form and content satisfactory of Bank.

7.    **PRESERVATION OF COLLATERAL AND PERFECTION OF SECURITY INTERESTS THEREIN.**

Borrower hereby irrevocably authorizes Bank to file such Uniform Commercial Code financing statements, amendments, renewals and assignments thereof, as Bank deems necessary and shall, at Bank's request, at any time and from time to time, authenticate, execute and deliver to Bank (or authorize Bank to file) such financing statements, documents and other agreements and instruments (and pay the cost of filing or recording the same in all public offices deemed necessary or desirable by Bank) and do such other acts and things or cause third parties to do such other acts and things as Bank may deem necessary or desirable in its sole discretion in order to establish and maintain a valid, attached and perfected security interest in the Collateral in favor of Bank (free and clear of all other liens, claims, encumbrances and rights of third parties whatsoever, whether voluntarily or involuntarily created, except Statutory Liens) to secure payment of the Liabilities, and in order to facilitate the collection of the Collateral. Borrower irrevocably hereby makes, constitutes and appoints Bank (and all Persons designated by Bank for that purpose) as Borrower's true and lawful attorney and agent-in-fact to execute and file such financing statements, documents and other agreements and instruments and do such other acts and things as may be necessary to preserve and perfect Bank's security interest in the Collateral.    Borrower further agrees that a carbon, photographic, photostatic or other reproduction of this Agreement or of a financing statement shall be sufficient as a financing statement, Borrower further ratifies and confirms the prior filing by Bank of any and all financing statements which identify Borrower as debtor, Bank as secured party and any or all Collateral as collateral.

8.    **REPRESENTATIONS AND WARRANTIES**.    Borrower represents and warrants as follows:

8.1    **Valid Organization, Good Standing and Qualification**.

(a)    Borrower is a limited liability company duly formed, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania, has full power and authority to execute, deliver and comply with the Loan Documents, and to carry on its business as it is now being conducted.

8.2    **Licenses**.    It has all licenses, registrations, approvals and other authority as may be necessary to enable it to own and operate its business and perform all services and business which Borrower has agreed to perform in any state, municipality or other jurisdiction.

8.3    **Financial Statements**.    Borrower has furnished to Bank its [audited] financial statements for its fiscal year ended [December 31, 2009].   Such financial statements of Borrower (together with the related notes and comments), are correct and complete, fairly

present the financial condition and the assets and liabilities of Borrower at such dates, and have been prepared in accordance with GAAP.

8.4 **Due Authorization; No Legal Restrictions**.  The execution and delivery by Borrower of the Loan Documents, the consummation of the transactions contemplated by the Loan Documents and the fulfillment and compliance with the respective terms, conditions and provisions of the Loan Documents:  (a) have been duly authorized by all requisite limited liability company action of Borrower, (b) will not conflict with or result in a breach of, or constitute a default (or might, upon the passage of time or the giving of notice or both, constitute a default) under, any of the terms, conditions or provisions of any applicable statute, law, rule, regulation or ordinance, or Borrower's certificate of formation or operating agreement or any indenture, mortgage, loan, credit agreement or other document or instrument to which Borrower is a party or by which Borrower may be bound or affected, or any judgment or order of any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, and (c) will not result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the property or assets of Borrower under the terms or provisions of any such agreement or instrument, except liens in favor of Bank.

8.5 **Enforceability**.  The Loan Documents have been duly executed by Borrower and delivered to Bank and constitute legal, valid and binding obligations of Borrower, enforceable in accordance with their terms.

8.6 **No Default Under Other Obligations, Orders or Governmental Regulations**.  Borrower is not in violation of its certificate of formation or operating agreement and Borrower is not in default in the performance or observance of any of its obligations, covenants or conditions contained in any indenture or other agreement creating, evidencing or securing any Indebtedness or pursuant to which any such Indebtedness is issued or in violation of or in default under any other agreement or instrument or any judgment, decree, order, statute, rule or governmental regulation, applicable to it or by which its properties may be bound or affected.

8.7 **Governmental Consents**.  No consent, approval or authorization of or designation, declaration or filing with any governmental authority on the part of Borrower is required in connection with the execution, delivery or performance by Borrower of the Loan Documents or the consummation of the transactions contemplated thereby.

8.8 **Taxes**.  Borrower has filed all tax returns which it is required to file and has paid, or made provision for the payment of, all taxes which have or may have become due pursuant to such returns or pursuant to any assessment received by it.  Such tax returns are complete and accurate in all respects.  Borrower does not know of any proposed additional assessment or basis for any assessment of additional taxes.

8.9 **Names; Addresses**.  During the past five (5) years, Borrower has not been known by any names (including trade names) other than those set forth in **Schedule 8.9** attached hereto and has not been located at any addresses other than those set forth on **Schedule 8.9** attached hereto.  **Schedule 8.9** identifies the chief executive office of Borrower.

B # 1131504 v.1

8.10    **Current Compliance**.  Borrower is currently in compliance with all of the terms and conditions of the Loan Documents.

8.11    **Accuracy of Representations and Warranties**.  No representation or warranty by any Borrower contained herein or in any certificate or other document furnished by Borrower pursuant hereto or in connection herewith fails to contain any statement of material fact necessary to make such representation or warranty not misleading in light of the circumstances under which it was made.  There is no fact which Borrower knows or should know and has not disclosed to Bank, which does or may materially and adversely affect Borrower, or any of its operations.

8.12    **Liens**.  Borrower is the lawful owner of all Collateral now purportedly owned or hereafter purportedly acquired by Borrower, free from all liens, claims, security interests and encumbrances whatsoever, whether voluntarily or involuntarily created and whether or not perfected, other than Statutory Liens or as set forth on **Schedule 8.12**.

8.13    **Equipment**.  Borrower has good and indefeasible and merchantable title to all owned Equipment.  No Equipment is a Fixture to real estate unless such real estate is owned by such Borrower and is subject to a mortgage in favor of Bank.

8.14    **Indebtedness**.  Except as set forth on **Schedule 8.14** hereto, Borrower is not obligated (directly or indirectly), for any loans or other indebtedness for borrowed money other than Indebtedness owed to Bank.

8.15    **Intellectual Property**.  Borrower possesses adequate licenses, patents, patent applications, copyrights, service marks, trademarks, trademark applications, trade styles and trade names to continue to conduct its business as heretofore conducted by it.

9.    **GENERAL COVENANTS**.  Borrower will comply with the following:

9.1    **Payment of Principal, Interest and Other Amounts Due**.  Borrower will pay when due all Bank Indebtedness and all other amounts payable by it hereunder.

9.2    **Disposition of Assets**.  Borrower will not sell, lease, transfer or otherwise dispose of all or substantially all of its property or assets other than (a) in the ordinary course of business (b) a sale pursuant to Section 363 of the Bankruptcy Code or pursuant to a Plan, on terms and conditions acceptable to Bank, in its sole discretion, and (c) otherwise as approved by Bank in writing

9.3    **Merger; Consolidation; Business Acquisitions; Subsidiaries**.  Borrower will not merge into or consolidate with any Person.

9.4    **Taxes; Claims for Labor and Materials**.  After the date hereof, Borrower will pay or cause to be paid when due all taxes, assessments, governmental charges or levies imposed upon it or its income, profits, payroll or any property belonging to it, including without limitation all withholding taxes, and all claims for labor, materials and supplies which, if unpaid, might become a lien or charge upon any of its properties or assets.

    B # 1131504 v.1

9.5   **Existence; Approvals; Qualification; Business Operations; Compliance with Laws**.  Borrower will (a) obtain, preserve and keep in full force and effect its separate existence and all rights, licenses, registrations and franchises necessary to the proper conduct of its business or affairs; and (b) continue to operate its business as presently operated. Borrower will comply with the requirements of all applicable laws and all rules, regulations (including environmental regulations) and orders of regulatory agencies and authorities having jurisdiction over it.

9.6   **Bank of Account**.  Borrower shall maintain its primary deposit accounts with Bank.

9.7   **Name; Address or State of Organization Change**.  Borrower will not change its name or change or add any address or location except upon written notice to Bank within thirty (30) days of such change.  Borrower shall not change its state of organization or take any action which would result in a change in Borrower's state of organization without Bank's prior written consent.

9.8   **Financial and Other Reporting**.  The Borrower agrees that it will deliver to Bank: (a) on Monday of each week commencing May 17, 2010 a report reflecting detail actual receipts and disbursements during the previous calendar week and a comparison of the actual receipts and disbursements for the week as well as on a cumulative basis through the end of the prior week; (b) notice of the occurrence of any Default or Event of Default immediately upon knowledge thereof; (c) all financial statements required under the Existing Financing Documents; and (d) from time to time, such further information regarding the business affairs and financial condition of the Borrower as Bank may reasonably request.  In addition, should the Borrower modify its accounting principles and procedures from those in effect on the Effective Date, the Borrower agrees to prepare and deliver to Bank statements of reconciliation in form and substance reasonably satisfactory to Bank.

9.9   **Payments of Fees and Claims**.  The Borrower shall make timely payment of all fees payable to the United States Trustee, if any, in the Bankruptcy Case pursuant to 28 U.S.C. Section 1930 (a)(6). In addition, without prior approval of the Bankruptcy Court and the prior written consent of Bank, the Borrower shall not make any payment of any proceeds constituting part of the Collateral or other cash (including, without limitation, proceeds of Revolving Loans) to any creditor of the Borrower on account of claims arising prior to the commencement of the Bankruptcy Case (including without limitation payments in respect of reclamation claims of unpaid suppliers of goods delivered to the Borrower prior to the commencement of the Bankruptcy Case (regardless of whether such claims have been granted administrative expense priority status pursuant to Section 546(c) of the Bankruptcy Code)) prior to confirmation of a plan of reorganization.

9.10   **Use of Proceeds and Payments of Expenses and Claims**.  No proceeds of the Line shall be used to pay administration expenses or priority claims under the Bankruptcy Case, except for (i) expenses and claims directly attributable to the business of the Borrower set forth in the Budget, (ii) subject to the Carve-Out limits, payments with respect to the fees and expenses of Professionals retained in connection with the Bankruptcy Case where such payment

B # 1131504 v.1

has been authorized by the Bankruptcy Court and this Agreement and (iii) payments contemplated by the then applicable Financing Order.

9.11  **Chapter 11 Claims**.  The Borrower shall not incur, create, assume, suffer to exist or permit any administrative expense or claim (whether now existing or hereafter arising, of any kind or nature whatsoever) which is superior to or pari passu with the liens granted to Bank, by this Agreement and the other Loan Documents or the Financing Order.

9.12  **Financing Order/No Superpriority Claims**.  The Borrower will not, directly or indirectly, seek, consent or suffer to exist (i) any modification, stay, vacation or amendment to either Financing Order, unless Bank has consented to such modification, stay, vacation or amendment in writing, (ii) a priority claim for any administrative expense or unsecured claim (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expenses of the kind specified in the Bankruptcy Code, including Sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507, 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code) equal or superior to the Superpriority Claim of Bank in respect to the Obligations, except for the Carve-Out; or (iii) any lien on any Collateral, having a priority equal or superior to the lien in favor of Bank in respect of the Obligations, except for the Carve-Out Liens and Statutory Liens securing Senior Claims.

9.13  **Petition/Notices**.  The Bankruptcy Case was commenced on the Filing Date in accordance with applicable law and proper notice thereof and the proper notice under the Bankruptcy Code for each of (a) the motion seeking approval of the Loan Documents and the Interim Financing Order and the Final Order, (b) the hearing for the approval of the Interim Financing Order and (c) the hearing for the approval of the Final Order, has been or will be given. The Borrower shall give, on a timely basis as specified in the Financing Order, all notices required to be given to all parties specified in such  Financing Order.

9.14  **Entry of DIP Orders**.  The Borrower covenants and agrees, in each case, unless extended by Bank in its sole and absolute discretion, (a) the Interim Financing Order shall be entered no later than May 13, 2010; (b) the Final Order shall be entered no later than May 31, 2010.

9.15  **Budget**.  The Borrower agrees to comply with the Budget.

9.16  **Additional Documents and Future Actions**.  Borrower will, at their sole cost, take such actions and provide Bank from time to time with such agreements and additional instruments, documents or information as the Bank may in its discretion deem necessary or advisable to carry out the terms of the Loan Documents.  Borrower hereby authorizes and appoints Bank as its attorney-in-fact, with full power of substitution, to execute on Borrower's behalf such other documents and notices as Bank may deem advisable to protect its rights hereunder.  Such power being coupled with an interest is irrevocable.

9.17  **Restrictions on Use of Proceeds**.  Borrower will not carry or purchase with the proceeds of any of the Loan any "margin security" within the meaning of Regulations U, G, T or X of the Board of Governors of the Federal Reserve System.

B # 1131504 v.1

9.18    **Inspection; Audits; Appraisal**.    Borrower shall permit Bank, or any Persons designated by it, to call at Borrower's places of business at any reasonable times so long as no Default or Event of Default has occurred and is continuing, or at any time upon the occurrence and during the continuance of a Default or Event of Default, and, without hindrance or delay, to inspect the Collateral and to inspect, audit, check and make extracts from Borrower's books, records, journals, orders, receipts and any correspondence and other data relating to Borrower's business, the Collateral or any transactions between the parties hereto, and shall have the right to make such verification concerning Borrower's business as Bank may consider reasonable under the circumstances. Borrower shall furnish to Bank such information relevant to Bank's rights under this Agreement and the Other Agreements as Bank shall at any time and from time to time request. Bank, through its officers, employees or agents shall have the right, at any time and from time to time, in Bank's name, to verify the validity, amount or any other matter relating to any of Borrower's Accounts, by mail, telephone, telecopy, electronic mail, or otherwise.    Borrower authorizes Bank to discuss the affairs, finances and business of Borrower with any officers, employees or directors of Borrower or with its Parent or any Affiliate or the officers, employees or directors of its Parent or any Affiliate, and to discuss the financial condition of Borrower with Borrower's independent public accountants.    Any such discussions shall be without liability to Bank or to Borrower's independent public accountants.    Borrower shall pay to Bank all customary fees and all costs and out-of-pocket expenses incurred by Bank in the exercise of its rights hereunder including, without limitation, airfare, lodging and meals, and all of such fees, costs and expenses shall constitute Bank Indebtedness hereunder, shall be payable on demand and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder.    Bank may obtain from time to time, at Borrower's expense, an appraisal of the Collateral by an appraiser acceptable to Lender.

9.19    **Insurance**.    Borrower shall:

(a)    Keep the Collateral properly housed and insured for the full insurable value thereof against loss or damage by fire, theft, explosion, sprinklers, collision (in the case of motor vehicles) and such other risks as are customarily insured against by Persons engaged in businesses similar to that of Borrower, with such companies, in such amounts, with such deductibles, and under policies in such form, as shall be satisfactory to Bank including, without limitation, business interruption insurance.  Original (or certified) copies of such policies of insurance have been or shall be, within ninety (90) days of the date hereof, delivered to Bank, together with evidence of payment of all premiums therefor, and shall contain an endorsement, in form and substance acceptable to Bank, showing loss under such insurance policies payable to Bank.  Such endorsement, or an independent instrument furnished to Bank, shall provide that the insurance company shall give Bank at least thirty (30) days written notice before any such policy of insurance is altered or canceled and that no act, whether willful or negligent, or default of Borrower or any other Person shall affect the right of Bank to recover under such policy of insurance in case of loss or damage.    In addition, Borrower shall cause to be executed and delivered to Bank an assignment of proceeds of its business interruption insurance policies. Borrower hereby directs all insurers under all policies of insurance to pay all proceeds payable thereunder directly to Bank. Borrower irrevocably makes, constitutes and appoints Bank (and all officers, employees or agents designated by Bank) as Borrower's true and lawful attorney (and agent-in-fact) for the purpose of making, settling and adjusting claims under such policies of insurance, endorsing the name of Borrower on any check, draft, instrument or other item of

B # 1131504 v.1

payment for the proceeds of such policies of insurance and making all determinations and decisions with respect to such policies of insurance.

(b)    Maintain, at its expense, such public liability and third party property damage insurance as is customary for Persons engaged in businesses similar to that of Borrower with such companies and in such amounts, with such deductibles and under policies in such form as shall be satisfactory to Bank and original (or certified) copies of such policies have been or shall be delivered to Bank prior to the Closing Date, together with evidence of payment of all premiums therefor; each such policy shall contain an endorsement showing Bank as additional insured thereunder and providing that the insurance company shall give Bank at least thirty (30) days written notice before any such policy shall be altered or canceled.

If a Borrower at any time or times hereafter shall fail to obtain or maintain any of the policies of insurance required above or to pay any premium relating thereto, then Bank, without waiving or releasing any obligation or default by Borrowers hereunder, may (but shall be under no obligation to) obtain and maintain such policies of insurance and pay such premiums and take such other actions with respect thereto as Bank deems advisable.  Such insurance, if obtained by Bank, may, but need not, protect Borrower's interests or pay any claim made by or against Borrower with respect to the Collateral.  Such insurance may be more expensive than the cost of insurance Borrower may be able to obtain on its own and may be cancelled only upon Borrower providing evidence that it has obtained the insurance as required above.  All sums disbursed by Bank in connection with any such actions, including, without limitation, court costs, expenses, other charges relating thereto and reasonable attorneys' fees, shall constitute Loans hereunder, shall be payable on demand by Borrower to Bank and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder.

B # 1131504 v.1

9.20   **Collateral**.  Borrower shall keep the Collateral in good condition, repair and order, normal wear and tear excepted, and shall make all necessary repairs to the Equipment and replacements thereof so that the operating efficiency and the value thereof shall at all times be preserved and maintained, other than with respect to Equipment that is damaged, obsolete or no longer useful in the business of Borrower.  Borrower shall permit Bank to examine any of the Collateral at such times as set forth in underline subsection 9.18 hereof and wherever the Collateral may be located and, Borrower shall, promptly upon request therefor by Bank, deliver to Bank any and all evidence of ownership of any of the Equipment including, without limitation, certificates of title and applications of title.   Borrower shall, at the request of Bank, indicate on its records concerning the Collateral a notation, in form satisfactory to Bank, of the security interest of Bank hereunder.

9.21   **Guaranties**.   Borrower shall not assume, guarantee or endorse, or otherwise become liable in connection with, the obligations of any Person, except by endorsement of instruments for deposit or collection or similar transactions in the ordinary course of business.

9.22   **Indebtedness**.   Borrower shall not create, incur, assume or become obligated (directly or indirectly), for any loans or other indebtedness for borrowed money other than the Bank Indebtedness, except that a Borrower may incur unsecured indebtedness to trade creditors in the ordinary course of business.

9.23   **Liens**.   Borrower shall not grant or permit to exist (voluntarily or involuntarily) any lien, claim, security interest or other encumbrance whatsoever on any of its assets, other than Statutory Liens existing as of the date hereof.

9.24   **Sale of Business**.  On or before May 17, 2010, Borrower shall engage an investment banker acceptable to Bank to market for sale the Borrower's assets.  A copy of the executed engagement letter between Borrower and Bank shall be delivered to Bank before 5:00 p.m. prevailing Eastern time on May 17, 2010.  Borrower shall file an application to retain such investment banker with the Bankruptcy Court by May 19, 2010.  Borrower shall cooperate with such investment banker to facilitate the marketing and sale of the Borrower's assets.  Borrower agrees that Bank may contact the investment directly from time to time to obtain status reports on the sale of the assets.

10.   **ENVIRONMENTAL**

10.1   **Environmental Indemnity**.   Borrower agrees to indemnify, defend and hold harmless Bank, its parents, subsidiaries, successors and assigns, and any officer, director, shareholder, employee, affiliate or agent of Bank, for all loss, liability, damage, cost and expenses, including, without limitation, attorney's fees and disbursements (including the reasonable allocated cost of in-house counsel and staff) arising from or related to (a) the release of any Special Materials at any facility at any time owned, leased or operated by Borrower, (b) the release of any Special Materials treated, stored, transported, handled, generated or disposed of by or on behalf of any Borrower at any third party owned site, and (c) any claim against any Borrower that it has failed to comply with all Environmental Requirements.

10.2   **Survival**.  The indemnification obligation of Borrower in this **Section 8**, shall survive the occurrence of any event whatsoever, including the payment of the Bank Indebtedness or any investigation by or knowledge of Bank, but shall be limited by the applicable statute of limitations.

11.   **CONDITIONS OF CLOSING**.  The obligation of Bank to make available the Loan is subject to the performance by Borrower of all of its agreements to be performed hereunder and to the following further conditions (any of which may be waived by Bank):

11.1   **Loan Documents**.  Borrower and all other required Persons will have executed and delivered to Bank the Loan Documents including, without limitation, the Surety Agreements.

11.2   **Budget**.  Bank shall have received, reviewed and been satisfied with the Budget.

11.3   **Certain Bankruptcy Case Matters**.

(a)   <u>Compliance with Requirements</u>.  The Borrower shall have complied in full with the notice and other requirements of the Bankruptcy Code and the related local and Federal rules of bankruptcy procedure in a manner acceptable to Bank and its counsel;

(b)   <u>Finding of Good Faith</u>.  The Bankruptcy Court shall have found that the Revolving Loans contemplated by this Agreement are made by Bank, and that all other Obligations are incurred by the Borrower hereunder in "good faith" within the meaning of Section 364(e) of the Bankruptcy Code;

(c)   <u>Interim Financing Order</u>.  The Bankruptcy Court shall have entered the Interim Financing Order by no later than four (4) days after the Filing Date in form and substance satisfactory to Bank, which Interim Financing Order shall: (i) have been entered upon application or motion of the Borrower reasonably satisfactory in form and substance to Bank and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by Bank; (ii) be in full force and effect and shall not have been amended, modified or stayed without the written consent of Bank or reversed; and (iii) not be the subject of a pending objection, appeal or motion for reconsideration in any respect. The Borrower and Bank shall be entitled to rely in good faith upon the Interim Financing Order notwithstanding any such objection, appeal or motion for reconsideration. Bank shall be permitted, and the Borrower shall be required, to perform their respective obligations in compliance with this Agreement, notwithstanding any such objection, appeal or motion for reconsideration unless the Interim Financing Order has been stayed by a court of competent jurisdiction.

(d)   <u>First Day Orders</u>.  Bank shall have received drafts of the "first day" pleadings in form and substance satisfactory to Bank on or before the date of the initial loans hereunder.

(e)   <u>Patriot Act</u>.  Bank shall have received all documentation and other information required by bank regulatory authorities under applicable "know your customer" and

anti-money laundering rules and regulations, including, without limitation, the United States Patriot Act and OFAC.

11.4 **Representations and Warranties**.  All representations and warranties of Borrower set forth in the Loan Documents will be true at and as of the date hereof.

11.5 **No Default**.  No condition or event shall exist or have occurred which would constitute a Default or Event of Default hereunder.

11.6 **Proceedings and Documents**.  All proceedings taken by Borrower in connection with the transactions contemplated by this Agreement and all documents incident to such transactions shall be satisfactory in form and substance to Bank and Bank's counsel, and Bank shall have received all documents or other evidence which it reasonably may request in connection with such proceedings and transactions.  Borrower shall have delivered to Bank a certificate, in form and substance satisfactory to Bank, dated the date hereof and signed on behalf of Borrower or by an officer of Borrower, certifying (a) true copies of the certificate of formation and operating agreement of Borrower in effect on such date, (b) true copies of all limited liability company action, taken by Borrower relative to the Loan Documents, and (c) the names, true signatures and incumbency of the officers of Borrower authorized to execute and deliver this Agreement and the other Loan Documents.  Bank may conclusively rely on such certificate unless and until a later certificate revising the prior certificate has been received by Bank.

11.7 **Delivery of Other Documents**.  The following documents shall have been delivered by or on behalf of Borrower to Bank:

(a) **Good Standing and Tax Lien Certificates**.  A good standing certificate from the state of incorporation or formation of Borrower certifying to the good standing and status of Borrower, good standing/foreign qualification certificates from all other jurisdictions in which Borrower is required to be qualified to do business, and tax lien certificates for Borrower from each jurisdiction in which Borrower is required to be qualified to do business.

(b) **Authorization Documents**.  Evidence of authorization of Borrower's execution and full performance of this Agreement, the Loan Documents and all other documents and actions required hereunder.

(c) **Other Documents**.  Such other documents as may be required to be submitted to Bank by the terms hereof or of any Loan Document.

11.8 **Non-Waiver of Rights**.  By completing the closing hereunder, or by making Advances hereunder, Bank does not thereby waive a breach of any warranty or representation made by Borrower hereunder or any agreement, document, or instrument delivered to Bank or otherwise referred to herein, and any claims and rights of Bank resulting from any breach or misrepresentation by Borrower are specifically reserved by Bank.

12.    **CERTAIN CONDITIONS TO SUBSEQUENT LINE ADVANCES**. Subsequent Advances under the Line shall be conditioned upon the following conditions and each request by Borrower for an advance shall constitute a representation by Borrower to Bank that each condition has been met or satisfied:

12.1    **Representations and Warranties**.  All representations and warranties of Borrower contained herein or in the Loan Documents shall be true at and as of the date of such Advance as if made on such date, and each request for an Advance shall constitute reaffirmation by Borrower that such representations and warranties are then true; and at the time of and after giving effect to each borrowing hereunder, the Borrower is in Budget Compliance.

12.2    **No Default**.  No condition or event shall exist or have occurred at or as of the date of such Advance which would constitute a Default or Event of Default hereunder.

12.3    **Budget Variance**.  The actual amount of cash funds and receipts received by the Borrower and cash disbursements made and expenses incurred by the Borrower during the prior week or Cumulative Period do not vary from the Budget approved by Bank for such period by an amount greater than (a) five percent (5%) with respect to cash disbursements and expenses incurred and (b) five percent (5%) with respect to collections.

12.4    **Compliance with Financing Orders**.  The extension of credit requested shall not cause the aggregate outstanding amount of the Revolving Line of Credit to exceed the amount then authorized by the applicable Financing Order, as the case may be, or any order modifying, reversing, staying or vacating such order shall have been entered or any appeal of such order shall have been timely filed.

12.5    **Final Order**.  Within twenty-six (26) days of the Filing Date, and for each extension of credit thereafter, Bank shall have received satisfactory evidence of the entry of the Final Order.

12.6    **Financing Order**.  The Final Order, or, prior to the entry of the Final Order, the Interim Financing Order, (i) shall have been entered upon application or motion of the Borrower reasonably satisfactory in form and substance to Bank and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by Bank; (ii) shall be in full force and effect and shall not have been amended, modified or stayed without the written consent of Bank or reversed; and (iii) not be the subject of a pending objection, appeal or motion for reconsideration in any respect. The Borrower and Bank shall be entitled to rely in good faith upon the applicable Financing Order notwithstanding any such objection, appeal or motion for reconsideration. Bank shall be permitted, and the Borrower shall be required, to perform their respective obligations in compliance with this Agreement, notwithstanding any such objection, appeal or motion for reconsideration unless the applicable Financing Order has been stayed by a court of competent jurisdiction.

12.7    **Other Requirements**.  Bank shall have received all certificates, authorizations, affidavits, schedules and other documents which are provided for hereunder or under the Loan Documents, or which Bank may reasonably request.

B # 1131504 v.1

13.    **DEFAULT AND REMEDIES.**

13.1    **Events of Default**.  The occurrence of any one or more of the following events shall constitute an Event or Events of Default hereunder:

(a)    The failure of Borrower to pay any amount of principal or interest on the Note, or any fee or other sums payable hereunder, or any other Bank Indebtedness, on the date on which such payment is due, whether on demand, at the stated maturity or due date thereof, or by reason of any requirement for the prepayment thereof, by acceleration or otherwise;

(b)    The failure of Borrower or either Guarantor to duly perform or observe any obligation, covenant or agreement on its part contained herein or in any other Loan Document;

(c)    The failure of Borrower or either Guarantor to pay or perform any other obligation to Bank under any other agreement or note or otherwise arising, whether or not related to this Agreement, after the expiration of any notice and/or grace periods permitted in such documents;

(d)    The suspension of the operation of either Borrower's present business, either Borrower;

(e)

(i)    Except as otherwise agreed to by Bank, the bringing of a motion by the Borrower or any other Person in the Bankruptcy Case to obtain additional financing under Section 364 of the Bankruptcy Code, to use cash collateral of Bank under Section 363 of the Bankruptcy Code, or to recover from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c), Section 552 of the Bankruptcy Code, or otherwise;

(ii)    the Borrower or any other Person seeks to incur, in a manner inconsistent with this Agreement or the then applicable Financing Order, indebtedness that is secured by a lien with priority equal to or superior to the post-petition liens or which is given super-priority administrative expense status under Bankruptcy Code Section 364(c)(i);

(iii)    notice is given of a sale under Section 363 of the Bankruptcy Code of all or part of the post-petition Collateral as to which Bank is not proposed to be paid in full or with respect to which Bank has not provided its prior written consent;

(iv)    the Bankruptcy Court shall enter an order granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (A) to allow any creditor to execute upon or enforce a lien on any Collateral, or (B) with respect to any lien of, or the granting of any lien on, any Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a material adverse effect on (1) the Borrower's ability to repay the Obligations hereunder in accordance with the terms hereof or (2)

B # 1131504 v.1

the Collateral or Bank's liens granted hereunder on the Collateral or the priority of a material portion of such liens;

(v)        an order is entered by the Bankruptcy Court appointing, or the Borrower or any other Person files an application for an order seeking the appointment of, without the prior written consent of Bank, an examiner with enlarged powers relating to the execution of the business (i.e., powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code;

(vi)        an order is entered by the Bankruptcy Court, without the prior written consent of Bank, (A) permitting any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Borrower equal or superior to the priority of Bank with respect to the Obligations, except for any Carve-Out agreed to by Bank in any Financing Order, or (B) granting or permitting the granting of a lien on the Collateral other than a Permitted Encumbrance;

(vii)        the Borrower fails to file a plan of reorganization containing a provision for termination of this Agreement and the indefeasible repayment in full, in cash of the Obligations of the Borrower within the exclusivity period provided in Section 1121 of the Bankruptcy Code, or seeks an extension of such exclusivity period without the prior written consent of Bank, or otherwise fails to provide for the indefeasible repayment in full, in cash of the Obligations;

(viii)        an order is entered by the Bankruptcy Court confirming a plan of reorganization in the Bankruptcy Case which does not (i) contain a provision for termination of this Agreement and the indefeasible payment in full in cash of all Obligations of the Borrower under this Agreement and the other Loan Documents (including, for these purposes, any Existing Financing Agreements) on or before the effective date of such plan or plans, and (ii) provide for the continuation of the liens and security interests granted to the Agent (and maintains the priorities of such liens and security interests) until such plan effective date, unless the Obligations have been indefeasibly paid in full, in cash, and this Agreement and all other Loan Documents have been terminated;

(ix)        any Person shall attempt to invalidate, reduce or otherwise impair the liens or security interests of Bank, or any claims or rights against such Person, or to subject any of the Collateral to assessment pursuant to Section 506(c), 552(b), or otherwise, of the Bankruptcy Code, or pursuant to other applicable law;

(x)        any lien or security interest created by this Agreement or the Financing Order shall, for any reason, cease to be valid;

(xi)        any action is commenced which contests any provision of any Financing Order (which does not include objecting to a motion seeking entry of any Financing Order), or the validity, perfection, priority or enforceability of any of the liens and security interests of Bank, as applicable;

B # 1131504 v.1

(xii)    the Bankruptcy Case is dismissed, or is converted to a case under chapter 7 of the Bankruptcy Code or a chapter 11 trustee is appointed without the written consent of Bank, or

(xiii)    the Borrower shall fail to perform any of its obligations in accordance with the terms of the then applicable Financing Order.

(f)    The indictment or threatened indictment of Borrower or either Guarantor under any criminal statute.

(g)    After the date hereof, all or any part of the assets of Borrower or either Guarantor are attached, seized, subjected to a writ or distress warrant, or levied upon, or come within the possession or control of any receiver, trustee, custodian or assignee for the benefit of creditors;

(h)    Any representation or warranty of Borrower or either Guarantor in any of the Loan Documents is discovered to be untrue in any material respect or any statement, certificate or data furnished by Borrower or either Guarantor pursuant hereto is discovered to be untrue in any material respect as of the date as of which the facts therein set forth are stated or certified;

(i)    Borrower voluntarily or involuntarily dissolves or is dissolved, terminates or is terminated;

(j)    Borrower is enjoined, restrained, or in any way prevented by the order of any court or any administrative or regulatory agency, the effect of which order restricts Borrower from conducting all or any material part of its business.

(k)    The loss, suspension, revocation or failure to renew any license or permit now held or hereafter acquired by Borrower; and/or

(l)    The validity or enforceability of this Agreement, or any of the Loan Documents, is contested by Borrower or either Guarantor, or Borrower or either Guarantor denies that it has any or any further liability or obligation hereunder or thereunder.

(m)    The Bankruptcy Court shall enter any order (i) suspending, superseding, revoking, reversing, staying, vacating, rescinding, modifying, supplementing or otherwise amending either Financing Order, this Agreement or any other Loan Document (except as otherwise approved by Bank in writing), or (ii) to grant or permit the grant of a lien on the Collateral other than Statutory Liens;

(n)    The entry of an order in the Bankruptcy Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owning under this Agreement or the other Loan Documents;

13.2    **Remedies**.  At the option of the Bank, upon the occurrence of an Event of Default, or at any time thereafter:

B # 1131504 v.1

(a)    The entire unpaid principal of the Line, all other Bank Indebtedness, or any part thereof, all interest accrued thereon, all fees due hereunder and all other obligations of Borrower to Bank hereunder or under any other agreement, note or otherwise arising will become immediately due and payable without any further demand or notice;

(b)    The Line will immediately terminate and the Borrower will receive no further extensions of credit thereunder;

(c)    Bank may increase the interest rate on the Lines to the Default Rate in accordance with **Section 3.2** above;

(d)    Bank may reduce the Maximum Line Amount, without prior notice; and/or

(e)    Upon the occurrence and during the continuance of an Event of Default, Bank may exercise from time to time any rights and remedies available to it under the Uniform Commercial Code and any other applicable law in addition to, and not in lieu of, any rights and remedies expressly in any of the Loan Documents and all of Bank's rights and remedies shall be cumulative and non-exclusive to the extent permitted by law.  Bank may disclaim any warranties that might arise in connection with the sale, lease or other disposition of the Collateral and has no obligation to provide any warranties at such time.  Any Proceeds of any disposition by Bank of any of the Collateral may be applied by Bank to the payment of expenses in connection with the Collateral, including, without limitation, legal expenses and reasonable attorneys' fees, and any balance of such Proceeds may be applied by Bank toward the payment of such of the Bank Indebtedness, and in such order of application, as Bank may from time to time elect and, pursuant to the Financing Order, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated (at Bank's election) to permit Bank to exercise its remedies under this Agreement and the Loan Documents, without further application or motion to, or order from, the Bankruptcy Court; provided, however, notwithstanding anything to the contrary contained herein, Bank shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of Company in the Collateral only upon five days prior written notice to the Company, the United States Trustee for the District of Pennsylvania, and any counsel approved by the Bankruptcy Court for the Creditors' Committee (the "**Remedies Notice Period**"); provided, however, that during such Remedies Notice Period, (i) the Company may not challenge or object to or file any motions attempting to limit the remedies of Bank hereunder other than to take any and all actions necessary to cure such Event of Default to Bank's satisfaction and (ii) the Company shall have no right to use or seek to use the Collateral or request or obtain Advances; provided further if the Bankruptcy Court does not determine that an Event of Default has not occurred, upon the expiration of such Remedies Notice Period, Bank shall have relief from the automatic stay without further notice or order as set forth herein. Upon the occurrence of an Event of Default and the exercise by Bank of its rights and remedies under this Agreement and the other Loan Documents, the Company shall assist Bank in effecting a sale or other disposition of the Collateral upon such terms as are designed to maximize the proceeds obtainable from such sale or other disposition; such assistance shall include, without limitation (if so requested), filing any motions under Sections 363 or 365 or any other applicable provisions of the Bankruptcy Code to authorize the transfer of all or any portion of the Collateral

B # 1131504 v.1

(f)    Bank shall have no obligation to marshal any Collateral or to seek recourse against or satisfaction of any of the Bank Indebtedness from one source before seeking recourse against or satisfaction from another source.  The net cash proceeds resulting from Bank's exercise of any of the foregoing rights to liquidate all or substantially all of the Collateral, including any and all collections (after deducting all of Bank's expenses related thereto), shall be applied by Bank to such of the Bank Indebtedness and in such order as Bank shall elect in its sole and absolute discretion, whether due or to become due.  Borrowers shall remain liable to Bank for any deficiencies.

(g)    To the extent permitted by law and not otherwise prohibited by contracts with third parties, Borrower hereby grants to Bank, for use by Bank solely in connection with the preservation or sale of any Collateral, a license or other right to use, without charge by Borrower or Subsidiary thereof, all computer software, copyrights, labels, trade secrets, service marks, patents, advertising materials and other rights, assets and materials used by Borrower and needed in connection with the preservation or sale of such Collateral.

Bank may exercise any other rights and remedies available to it at law and/or equity.

13.3    **Set-Off**.  Without limiting the rights of Bank under applicable law, Bank has and may exercise a right of set-off, a lien against and a security interest in all property of Borrower now or at any time in Bank's possession in any capacity whatsoever, including but not limited to any balance of any deposit, trust or agency account, or any other bank account with Bank, as security for all Bank Indebtedness.  At any time and from time to time following the occurrence of an Event of Default, Bank may without notice or demand, set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by Bank to or for the credit of Borrower against any or all of the Bank Indebtedness and the Borrower's obligations under the Loan Documents.

13.4    **Turnover of Property Held by Bank**.  Borrower irrevocably authorizes any Affiliate of Bank, upon and following the occurrence of an Event of Default, at the request of Bank and without further notice, to turnover to Bank any property of Borrower held by such Affiliate, including, without limitation, funds and securities for Borrower's account and to debit, for the benefit of Bank, any deposit account maintained by Borrower with such Affiliate (even if such deposit account is not then due or there results a loss or reduction of interest or the imposition of a penalty in accordance with law applicable to the early withdrawal of time deposits), in the amount requested by Bank up to the amount of the Bank Indebtedness, and to pay or transfer such amount or property to Bank for application to the Bank Indebtedness.

13.5    **Delay or Omission Not Waiver**.  Neither the failure nor any delay on the part of Bank to exercise any right, remedy, power or privilege under the Loan Documents upon the occurrence of any Event of Default or otherwise shall operate as a waiver thereof or impair any such right, remedy, power or privilege.  No waiver of any Event of Default shall affect any later Event of Default or shall impair any rights of Bank.  No single, partial or full exercise of any rights, remedies, powers and privileges by the Bank shall preclude further or other exercise thereof.  No course of dealing between Bank and Borrower shall operate as or be deemed to

B # 1131504 v.1

constitute a waiver of Bank's rights under the Loan Documents or affect the duties or obligations of Borrower.

13.6    **Remedies Cumulative; Consents**.   The rights, remedies, powers and privileges provided for herein shall not be deemed exclusive, but shall be cumulative and shall be in addition to all other rights, remedies, powers and privileges in Bank's favor at law or in equity. Whenever Bank's consent or approval is required, such consent or approval shall be at the sole and absolute discretion of Bank.

13.7    **Certain Fees, Costs, Expenses, Expenditures and Indemnification**. Borrower agrees to pay on demand all costs and expenses of Bank, including, without limitation:

(a)    all losses, costs and expenses in connection with the enforcement, protection and preservation of the Bank's rights or remedies under the Loan Documents, or any other agreement relating to any Bank Indebtedness, or in connection with legal advice relating to the rights or responsibilities of Bank (including without limitation court costs, attorney's fees and expenses of accountants and appraisers); and

(b)    any and all stamp and other taxes payable or determined to be payable in connection with the execution and delivery of the Loan Documents, and all liabilities to which Bank may become subject as the result of delay in paying or omission to pay such taxes.

In the event Borrower shall fail to pay taxes, insurance, assessments, costs or expenses which it is required to pay hereunder, or otherwise breaches any obligations under the Loan Documents, Bank in its discretion, may make expenditures for such purposes and the amount so expended (including attorney's fees and expenses, filing fees and other charges) shall be payable by Borrower on demand and shall constitute part of the Bank Indebtedness.

With respect to any amount required to be paid by Borrower under this Section, in the event Borrower fails to pay such amount on demand, Borrower shall also pay to Bank interest thereon at the Default Rate.

Borrower agrees to indemnify and hold harmless, Bank and Bank's officers, directors, shareholders, employees and agents, from and against any and all claims, liabilities, losses, damages, costs and expenses (whether or not such Person is a party to any litigation), including attorney's fees and costs and costs of investigation, document production, attendance at depositions or other discovery with respect to or arising out of this Agreement or any of the other Loan Documents, the use of any proceeds advanced hereunder, the transactions contemplated hereunder, or any claim, demand, action or cause of action being asserted against Borrower or any of its Affiliates.

Borrower's obligations under this Section shall survive termination of this Agreement and repayment of the Bank Indebtedness.

13.8    **Time is of the Essence**.   Time is of the essence in Borrower's performance of its obligations under the Loan Documents.

B # 1131504 v.1

13.9   **Acknowledgement of Confession of Judgment Provisions**. BORROWER ACKNOWLEDGES AND AGREES THAT THE NOTE AND THE LOAN DOCUMENTS CONTAIN PROVISIONS WHEREBY Bank MAY ENTER JUDGMENT BY CONFESSION AGAINST BORROWER. BEING FULLY AWARE OF ITS RIGHTS TO PRIOR NOTICE AND HEARING ON THE QUESTION OF THE VALIDITY OF ANY CLAIMS THAT MAY BE ASSERTED AGAINST IT BY Bank UNDER THE NOTES AND LOAN DOCUMENTS BEFORE JUDGMENT CAN BE ENTERED, BORROWER HEREBY WAIVES THESE RIGHTS AND AGREES AND CONSENTS TO Bank ENTERING JUDGMENT AGAINST BORROWER BY CONFESSION.   ANY PROVISION IN A CONFESSION OF JUDGMENT IN ANY OF THE LOAN DOCUMENTS FOR AN ATTORNEY'S COLLECTION COMMISSION SHALL IN NO WAY LIMIT BORROWER'S LIABILITY TO REIMBURSE Bank FOR ALL LEGAL FEES ACTUALLY INCURRED BY Bank, INCLUDING, WITHOUT LIMITATION, FEES INCURRED POST-JUDGMENT EVEN IF SUCH FEES ARE IN EXCESS OF THE ATTORNEY'S COLLECTION COMMISSION PROVIDED FOR IN SUCH CONFESSION OF JUDGMENT.

14.   **COMMUNICATIONS AND NOTICES.**

14.1   **Communications and Notices**.   All notices, requests and other communications made or given in connection with the Loan Documents shall be in writing and, unless receipt is stated herein to be required, shall be deemed to have been validly given if delivered personally to the individual or division or department to whose attention notices to a party are to be addressed, or by private carrier, or registered or certified mail, return receipt requested, or by telecopy with the original forwarded by first-class mail, in all cases, with charges prepaid, addressed as follows, until some other address (or individual or division or department for attention) shall have been designated by notice given by one party to the other:

To  Borrower:

> Dietrich's Specialty Processing, LLC
> Lincoln Corporate Center
> 61 Vanguard Drive
> Reading, PA  19606
> Attention: Thomas W. Dietrich, President

With a copy to:

> Case, DiGiamberardin & Lutz, PC
> 845 North Park Road, Suite 101
> Wyomissing, PA  19610
> Attention:  Dexter K. Case, Esquire
> Telecopy Number:  (610) _____

To Bank:

> VIST Bank
> 1240 Broadcasting Road
> P.O. Box 6219

B # 1131504 v.1

Wyomissing, PA  19610
Attention:  Andrew H. Bowman, Senior Vice President/Managed Assets
Telecopier:  (610) 288-1892

With a copy to:

Stradley Ronon Stevens & Young, LLP
2600 One Commerce Square
Philadelphia, PA  19103
Attention:  Gretchen M. Santamour, Esquire
Telecopy Number:  (215) 564-8120

## 15.   **WAIVERS.**

15.1   **Waivers.**   **In connection with any proceedings under the Loan Documents, including without limitation any action by Bank in replevin, foreclosure or other court process or in connection with any other action related to the Loan Documents or the transactions contemplated hereunder, Borrower waives:**

(a)   **all errors, defects and imperfections in such proceedings;**

(b)   **all benefits under any present or future laws exempting any property, real or personal, or any part of any proceeds thereof from attachment, levy or sale under execution, or providing for any stay of execution to be issued on any judgment recovered under any of the Loan Documents or in any replevin or foreclosure proceeding, or otherwise providing for any valuation, appraisal or exemption;**

(c)   **presentment for payment, demand, notice of demand, notice of non-payment, protest and notice of protest of any of the Loan Documents, including the Note; and**

(d)   **any requirement for bonds, security or sureties required by statute, court rule or otherwise.**

15.2   **Forbearance**.  Bank may release, compromise, forbear with respect to, waive, suspend, extend or renew any of the terms of the Loan Documents, without notice to Borrower.

15.3   **Limitation on Liability**.  Borrower shall be responsible for and Bank is hereby released from any claim or liability in connection with any act or default of another Person.  Bank shall only be liable for any act or omission on its part constituting willful misconduct.  In the event that Bank breaches its required standard of conduct, Borrower agrees that its liability shall be only for direct damages suffered and shall not extend to consequential or incidental damages.  In the event Borrower brings suit against Bank in connection with the transactions contemplated hereunder and Bank is found not to be liable, Borrower will indemnify and hold Bank harmless from all costs and expenses, including attorney's fees, including, without limitation, attorney's fees incurred post-judgment incurred by Bank in connection with such suit.

B # 1131504 v.1

This Agreement is not intended to obligate Bank to incur expenses or perform any obligation or duty of Borrower.

16.     **SUBMISSION TO JURISDICTION.**

        16.1     **Submission to Jurisdiction**.  Borrower hereby consents to the exclusive jurisdiction of any state or federal court located within the Commonwealth of Pennsylvania, and irrevocably agrees that, subject to the Bank's election, all actions or proceedings relating to the Loan Documents or the transactions contemplated hereunder shall be litigated in such courts, and Borrower waives any objection which it may have based on lack of personal jurisdiction, improper venue or forum non conveniens to the conduct of any proceeding in any such court and waives personal service of any and all process upon it, and consents that all such service of process be made by mail or messenger directed to it at the address set forth in **Section 14.1**. Nothing contained in this **Section 16.1** shall affect the right of Bank to serve legal process in any other manner permitted by law or affect the right of Bank to bring any action or proceeding against Borrower or its property in the courts of any other jurisdiction.

17.     **USA PATRIOT ACT PROVISIONS.**

        17.1     **USA Patriot Act Notice**.  Bank hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow Bank to identify the Borrower in accordance with the Patriot Act.

        17.2     **OFAC Compliance**.  No Borrower, Subsidiary of Borrower or Affiliate of Borrower (i) is a Sanctioned Person, (ii) has more than 15% of its assets in Sanctioned Countries, or (iii) derives more than 15% of its operating income from investments in, or transactions with Sanctioned Persons or Sanctioned Countries.  The proceeds of the Loan will not be used and have not been used to fund any operations in, finance any investments or activities in or make any payments to, a Sanctioned Person or a Sanctioned Country.

18.     **MISCELLANEOUS.**

        18.1     **Use of Bank's Name**.  Borrower shall not use Bank's name or the name of any of Bank's Affiliates in connection with any of its business or activities except as may otherwise be required by the rules and regulations of the Securities and Exchange Commission or any like regulatory body and except as may be required in its dealings with any governmental agency.

        18.2     **No Joint Venture**.  Nothing contained herein is intended to permit or authorize Borrower to make any contract on behalf of Bank, nor shall this Agreement be construed as creating a partnership, joint venture or making Bank an investor in Borrower.

        18.3     **Survival**.  All covenants, agreements, representations and warranties made by Borrower in the Loan Documents or made by or on its behalf in connection with the transactions contemplated herein shall be true at all times this Agreement is in effect and shall

B # 1131504 v.1

survive the execution and delivery of the Loan Documents, any investigation at any time made by Bank or on its behalf and the making by Bank of the loans or advances to Borrower.  All statements contained in any certificate, statement or other document delivered by or on behalf of Borrower pursuant hereto or in connection with the transactions contemplated hereunder shall be deemed representations and warranties by Borrower.

18.4   **No Assignment by Borrower**.  Borrower may not assign any of its rights hereunder without the prior written consent of Bank and any such assignment shall be void and of no force or effect. Bank shall not be required to lend hereunder except to Borrower as it presently exists.

18.5   **Assignment or Sale by Bank**.  Bank may sell, assign or participate all or a portion of its interest in the Loan Documents and in connection therewith may make available to any prospective purchaser, assignee or participant any information relative to Borrower in its possession.

18.6   **Binding Effect**.  This Agreement and all rights and powers granted hereby will bind and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

18.7   **Severability**.   The provisions of this Agreement and all other Loan Documents are deemed to be severable, and the invalidity or unenforceability of any provision shall not affect or impair the remaining provisions which shall continue in full force and effect.

18.8   **No Third Party Beneficiaries**.  Other than the Carve-Out, the rights and benefits of this Agreement and the Loan Documents shall not inure to the benefit of any third party.

18.9   **Modifications**.  No modification of this Agreement or any of the Loan Documents shall be binding or enforceable unless in writing and signed by or on behalf of the party against whom enforcement is sought.

18.10   **Holidays**.  If the day provided herein for the payment of any amount or the taking of any action falls on a Saturday, Sunday or public holiday at the place for payment or action, then the due date for such payment or action will be the next succeeding Business Day.

18.11   **Law Governing**.  This Agreement has been made, executed and delivered in the Commonwealth of Pennsylvania and will be construed in accordance with and governed by the laws of such State without regard to conflict of law principles.

18.12   **Integration**.  The Loan Documents shall be construed as integrated and complementary of each other, and as augmenting and not restricting Bank's rights, powers, remedies and security.  The Loan Documents contain the entire understanding of the parties thereto with respect to the matters contained therein and supersede all prior agreements and understandings between the parties with respect to the subject matter thereof and do not require parol or extrinsic evidence in order to reflect the intent of the parties.  In the event of any inconsistency between the terms of this Agreement and the terms of the other Loan Documents, the terms of this Agreement shall prevail.

B # 1131504 v.1

18.13  **Exhibits and Schedules**.  All exhibits and schedules attached hereto are hereby made a part of this Agreement.

18.14  **Headings**.  The headings of the Articles, Sections, paragraphs and clauses of this Agreement are inserted for convenience only and shall not be deemed to constitute a part of this Agreement.

18.15  **Counterparts**.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties hereto may execute this Agreement by signing any such counterpart.

18.16  **Waiver of Right to Trial by Jury**.  **BORROWER AND Bank WAIVE ANY RIGHT TO TRIAL BY JURY ON ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (a) ARISING UNDER ANY OF THE LOAN DOCUMENTS OR (b) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF BORROWER OR Bank WITH RESPECT TO ANY OF THE LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE. BORROWER AND Bank AGREE AND CONSENT THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF BORROWER AND Bank TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.  BORROWER ACKNOWLEDGES THAT IT HAS HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL REGARDING THIS SECTION, THAT IT FULLY UNDERSTANDS ITS TERMS, CONTENT AND EFFECT, AND THAT IT VOLUNTARILY AND KNOWINGLY AGREES TO THE TERMS OF THIS SECTION.**

B # 1131504 v.1

18.17  **Credit Inquiries**.  Borrower hereby consent to Bank responding from time to time to credit inquiries regarding Borrower.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

**DIETRICH'S SPECIALTY PROCESSING, LLC**


By:_____
Thomas W. Dietrich, President


**VIST BANK**


By:_____
Andrew H. Bowman, Senior Vice President/Managed Assets

B # 1131504 v.1

## **EXHIBITS**

Exhibit "A"    -    Note

Exhibit "B"    Budget

B # 1131504 v.1

**<u>SCHEDULES</u>**